# IN THE COURT OF APPEALS OF IOWA

————————————

No. 25-0227
Filed July 22, 2026

————————————

**State of Iowa,**
Plaintiff–Appellee,
v.
**Christopher Craig McVay Jr.,**
Defendant–Appellant.

————————————

Appeal from the Iowa District Court for Scott County,
The Honorable Meghan Corbin (motion to dismiss) and The Honorable
Tamra Roberts (trial), Judges.

————————————

**AFFIRMED**

————————————

Martha J. Lucey, State Appellate Defender, and Rachel C. Regenold
(argued), Assistant Appellate Defender, attorneys for appellant.

Brenna Bird, Attorney General, and Aaron Rogers (argued), Assistant
Attorney General, attorneys for appellee.

————————————

Heard at oral argument
by Tabor, C.J., and Schumacher, Ahlers, Chicchelly, and Langholz, JJ.
Opinion by Ahlers, J.

**AHLERS, Judge.**

One evening in 2008, a woman was assaulted near a bar in Davenport. The same night, she went to a hospital and underwent a sexual assault examination, which included collecting biological evidence from her for a rape kit. In 2024, DNA from the rape kit matched a sample in a national database. That sample came from Christopher McVay Jr. Shortly thereafter, the State charged McVay with second-degree sexual abuse. *See* Iowa Code § 709.3 (2008). A jury found him guilty of the lesser included offense of assault with intent to commit sexual abuse. *See id.* § 709.11.

McVay appeals. He contends: (1) the delay in prosecution violated his due process rights; (2) the district court erred by refusing to apply the residual hearsay exception to admit a statement from a now-deceased witness; and (3) the court erred by admitting a report from an out-of-state laboratory under the presumption of admissibility in Iowa Code section 691.2 (2024). Following our review, we affirm.

## I.    Factual and Procedural Background

At trial, the State presented evidence of the following. On the night in question, the woman went to a bar where her uncle worked to have drinks. The woman left the bar around closing—about five hours later. As the woman walked to her car, McVay came up behind her, put his arm around her neck in a sort of headlock, and forced her into an SUV with help from another man. The woman testified that the other man held her down while McVay forced his penis inside her vagina and then the men switched roles.

Afterward, the woman went to her uncle's home. She testified that when her uncle opened the door he told her, "Don't be bringing this shit here." Then the woman went to the hospital for a rape kit examination.

The woman reported the assault to law enforcement, but they closed the case soon after because they could not locate or contact her based on the phone numbers and address she provided. A message the woman left the police about her case was inadvertently deleted. About a year later, the woman called the police to get an update on the investigation. The investigation was reopened, and an officer interviewed her uncle. According to the officer's report, her uncle said that when the woman showed up to his house that night, she did not ask for help or look in need of it. Instead, she asked her uncle if he wanted to go back to the bar to get some more drinks, and he declined. Her uncle also suggested that he had seen McVay later and McVay admitted to having sex with the woman but claimed it was consensual. The uncle told the officer he did not know how to locate McVay, and police closed the investigation.

The rape kit was sent to Bode Cellmark Forensics (Bode), a private laboratory in Virginia, for DNA testing in 2017. Bode completed the DNA testing, and the DNA profile was added to CODIS.[1] In 2023, McVay's DNA was added to the same system, and it matched with the DNA found in the rape kit. Shortly thereafter, the State charged McVay with second-degree sexual abuse.

Prior to trial, McVay filed a motion to dismiss, arguing his due process rights were violated by the lengthy delay between the claimed offense and prosecution of the case because two witnesses became unavailable in the

---

[1] "CODIS is the acronym for the Combined DNA Index System and is the generic term used to describe the FBI's program of support for criminal justice DNA databases as well as the software used to run these databases." *State v. Burns*, 988 N.W.2d 352, 386 n.15 (Iowa 2023) (Oxley, J., dissenting) (citation omitted).

interim.[2] The district court denied the motion to dismiss after concluding the trial information was filed in accordance with Iowa Code section 802.2(2) (2008).[3] At trial, McVay argued that the uncle's statements should come in through the officer's testimony based on the residual hearsay exception. And he challenged the admissibility of the report Bode created. The district court rejected both McVay's request to admit evidence of the uncle's statements and his challenge to the admissibility of the Bode report. Ultimately, a jury convicted McVay of the lesser-included offense of assault with intent to commit sexual abuse. *See* Iowa Code § 709.11.

McVay appeals, raising his due process argument and evidentiary claims. We address each in turn.

## II. Due Process Challenge

McVay claims the State violated his due process rights under the Fifth and Fourteenth Amendments to the United States Constitution and article I, section 9 of the Iowa Constitution by prosecuting him approximately fifteen years after the crime occurred. We review constitutional claims de novo. *State v. Liggins*, 978 N.W.2d 406, 434 (Iowa 2022). And because our supreme court has considered challenges to prosecutorial delays rooted both in state and federal due process rights under the same standards, we likewise

---

[2] The uncle died in 2020, and neither party was able to locate the law enforcement officer who took the woman's initial statement.

[3] Iowa Code section 802.2(2) provides:

> An information or indictment for any other sexual abuse in the first, second, or third degree shall be found within ten years after its commission, or if the person against whom the information or indictment is sought is identified through the use of a DNA profile, an information or indictment shall be found within three years from the date the person is identified by the person's DNA profile, whichever is later.

consider McVay's challenges in tandem. *See State v. Smith*, 957 N.W.2d 669, 680 (Iowa 2021); *State v. Isaac*, 537 N.W.2d 786, 788 (Iowa 1995).

"There is no constitutional right to be arrested and charged at the precise moment probable cause comes into existence." *State v. Trompeter*, 555 N.W.2d 468, 470 (Iowa 1996). "But if the government delays filing charges to intentionally gain a tactical advantage over the accused, the defendant's due process rights are implicated." *Id.* (cleaned up). Accordingly, defendants may challenge preaccusatorial delays on due process grounds. *State v. Hall*, 395 N.W.2d 640, 642 (Iowa 1986). To establish a due process violation, "a defendant has the heavy burden of proving both (1) the defendant's defense suffered *actual* prejudice due to a delay in prosecution and (2) the delay causing such prejudice was unreasonable." *Smith*, 957 N.W.2d at 677 (quoting *State v. Brown*, 656 N.W.2d 355, 363 (Iowa 2003)); *cf. United States v. Lovasco*, 431 U.S. 783, 790 (1977).

As to the first element, our supreme court's "emphasis on actual prejudice has been unwavering." *Smith*, 957 N.W.2d at 677. So "'generalized claims of prejudice' are insufficient." *Id.* (citation omitted). "If the defendant is asserting witnesses are missing as a result of the delay, he must show the witness would have provided material evidence for the defense." *Hall*, 395 N.W.2d at 643. Here, in order to establish actual prejudice, McVay points to the unavailability of two witnesses—the since-retired officer who initially took the woman's statement and could not be located and the woman's uncle who died in the interim. McVay reasons that testimony from the officer would be material to his defense because it would help him establish how the woman's retelling of events changed over time. And he reasons that the uncle's testimony would be material because it would contradict the woman's claim about what the uncle said that night and show

that she did not appear to be in any sort of distress. But we need not decide whether McVay suffered actual prejudice from his inability to call either person as a witness because McVay cannot establish the second element—that the delay in prosecution was unreasonable.

We balance the length of the delay, which is admittedly extensive here, "and any valid reason for it, . . . against the resulting prejudice against the defendant." *Trompeter*, 555 N.W.2d at 470. In this case, the investigation stalled out because law enforcement did not have correct contact information for the woman and a voicemail from her was inadvertently deleted. Once the woman called to check on the case progress, investigators reopened the case and interviewed the uncle but closed the case because they did not pinpoint a suspect.[4] That all changed after McVay's DNA was collected and entered into CODIS. His DNA sample matched the samples collected from the woman during the rape kit examination. Once McVay was linked to the crime, law enforcement acted swiftly, and he was charged shortly thereafter. Our supreme court has recognized that "further investigation into the crime" to obtain more evidence is an "'obvious example' of a legitimate reason" to justify a delay in charging a defendant. *State v. Cahill*, 972 N.W.2d 19, 32 (Iowa 2022) (citation omitted). So there were valid reasons for the delay, and there is no record evidence that the State engaged in gamesmanship to gain any tactical advantage. *See Trompeter*, 555 N.W.2d at 470–71 (identifying non-exclusive legitimate reasons for a delay and explaining instances when a delay in prosecution is not permissible). When

---

[4] We understand that McVay argues that his identity could have been discovered earlier through a more thorough investigation. We think more dogged police work is always beneficial when investigating a potential crime. But we are also cognizant that law enforcement has limited time and resources to allocate between investigations.

we balance that against McVay's inability to call the two would-be witnesses to testify, we conclude that the delay was not unreasonable.

Because McVay cannot establish that the delay in prosecution was unreasonable, his due process challenge fails.

## III.    Residual Hearsay Exception

Next, McVay argues the district court erred when it did not permit admission of the uncle's statements to an investigating officer under the residual hearsay exception.  Although we typically review evidentiary challenges for abuse of discretion, we review hearsay challenges for errors at law.  *State v. Fontenot*, 958 N.W.2d 549, 555 (Iowa 2021).

"Hearsay" is any out-of-court statement offered "into evidence to prove the truth of the matter asserted in the statement."  Iowa R. Evid. 5.801(c).  Hearsay is not admissible unless an exception applies.  Iowa R. Evid. 5.802.  McVay contends the residual hearsay exception permitted admission of the uncle's statement.  The residual hearsay exception applies when (1) the evidence is "supported by sufficient guarantees of trustworthiness," (2) the evidence "is more probative . . . than any other evidence that the proponent can obtain through reasonable efforts," and (3) the offering party gives reasonable notice of intent to use the evidence to the opposing party.  Iowa R. Evid. 5.807.  As we turn to the particulars of the instant case, we are cognizant that the exception is narrow and should be applied sparingly.  *Liggins*, 978 N.W.2d at 432.

The district court determined the exception did not apply because the statement was not sufficiently trustworthy.  Finding that requirement to be dispositive, we likewise limit our analysis.  As to trustworthiness, the relevant consideration is whether, under the totality of the circumstances, the

proffered evidence "is supported by sufficient guarantees of trustworthiness." Iowa R. Evid. 5.807(a)(1).

There is little in the instant case to suggest the report containing the uncle's statement is sufficiently trustworthy. *See Liggins*, 978 N.W.2d at 432 (recognizing "we may consider both the trustworthiness of the declarant and the credibility of a witness reporting the statement"). First, the report containing the statement only summarized the officer's recollection of the interview with the uncle, calling into question how accurately the report reflected the uncle's statements. Second, the statement the uncle purportedly made regarding what the woman said when she knocked on his door—that she wanted him to come have another drink with her at the bar— would be nonsensical given the timeline of events. By the time the woman came to her uncle's front door, the bar had already closed, and she would have known that given that she left around closing time. Moreover, the fact that the woman went to the hospital for a rape kit examination shortly thereafter strongly calls into question the uncle's claim that she was seeking to continue a night of drinking rather than looking for help. Third, the interview with the uncle occurred about a year after the assault, and it was not recorded.

Like the district court, we conclude that the report is not sufficiently trustworthy, ending our inquiry. To rule otherwise would risk usurping our general hearsay rule. *See id.* ("An overly broad residual exception could emasculate the hearsay rule and the recognized exceptions or vitiate the rationale behind codification of the rules. It is intended that the residual exceptions will be used very rarely, and only in exceptional circumstances." (cleaned up)). The district court did not err in concluding the uncle's

8

statements did not meet the standards for admissibility under the residual hearsay exception.

## IV. Application of Section 691.2(1) (2024) to Out-of-State Laboratories

At trial, the State offered an exhibit consisting of a report created by Bode, a private laboratory in Virginia. The report contained information about the DNA analysis from the rape kit done on the woman that later matched McVay's DNA after it was placed in CODIS. McVay objected, contending foundation to authenticate the document had not been established. The district court admitted the report, finding it admissible under Iowa Code section 691.2 (2024). Even though the report was not prepared by the Iowa criminalistics laboratory, the court reasoned that the report was admissible because "there's no limitation to the outsourcing for this type of work" so the report "shouldn't be treated any differently under [section] 691.2."

On appeal, McVay contends admission of the report constituted error because section 691.2 only provides presumptive admissibility when the report at issue is prepared by the Iowa criminalistics laboratory. The State responds by relying on Iowa Code section 709.10(1)(d), which defines "laboratory" to mean "the state criminalistics laboratory or similar qualified laboratory." The State argues the Bode report was generated by a "similar qualified laboratory," so it meets the definition of "laboratory" under section 709.10(1)(d) and is entitled to the same presumption of admissibility under section 691.2 as if it had been prepared by the Iowa criminalistics laboratory.

We start with the statute. Iowa Code section 691.2(1) provides:

9

It shall be presumed that any employee or technician of the criminalistics laboratory is qualified or possesses the required expertise to accomplish any analysis, comparison, or identification done by the employee in the course of the employee's employment in the criminalistics laboratory. Any report, or copy of a report, or the findings of the criminalistics laboratory shall be received in evidence, if determined to be relevant, in any court, preliminary hearing, grand jury proceeding, civil proceeding, administrative hearing, and forfeiture proceeding in the same manner and with the same force and effect as if the employee or technician of the criminalistics laboratory who accomplished the requested analysis, comparison, or identification had testified in person.

"In interpreting a statute, we first consider the plain meaning of the relevant language, read in the context of the entire statute, to determine whether there is ambiguity." *State v. Doe*, 903 N.W.2d 347, 351 (Iowa 2017). As to section 691.2(1), we note that it and several other sections in chapter 691 specifically refer to "*the* criminalistics laboratory," implying that the presumption of admissibility only applies to a specific laboratory. *See* Iowa Code §§ 691.2(1), .7, .8 (emphasis added). Further, section 691.1 creates "a state criminalistics laboratory," section 691.3 requires the commissioner to "make rules defining the capabilities of the criminalistics laboratory," and section 691.9 provides details about funding for "the criminalistics laboratory facility in Ankeny." When read within the context of chapter 691, the statute clearly and unambiguously applies only to the "the criminalistics laboratory" created by the commissioner. *See id.* at §§ 691.1–.2.

We are not persuaded by the State's argument that section 709.10(1)(d) expands the scope of section 691.2 to include reports by a "similar qualified laboratory." For starters, even if section 709.10(1)(d) did so expand the scope of section 691.2, the State does not identify any evidence in the record that supports a conclusion that Bode is a laboratory that is

similarly qualified to the Iowa criminalistics laboratory. We simply don't know what Bode's qualifications are. So, even if we accepted the State's premise that section 709.10(1)(d) expanded section 691.2's scope, it doesn't apply on this record.

Second, we reject the State's premise that section 709.10(1)(d) applies to expand section 691.2 to include laboratories other than the Iowa criminalistics laboratory. As noted, section 709.10(1)(d) defines laboratory to mean "the state criminalistics laboratory or similar qualified laboratory." This provision was added to the Code in 2021. 2021 Iowa Acts ch. 107, § 2. If the legislature intended section 709.10(1)(d)'s expansive definition of "laboratory" to apply to chapter 691.2, it could have easily said that either in section 709.10(1)(d) or in chapter 691. *Cf. State v. Lind*, ____ N.W.3d____, ____, 2026 WL 1765364, at *9–10 (Iowa 2026) (concluding the legislature's addition of language criminalizing offenses against minors "including a law enforcement officer or agent posing" as such to one statute but not to a similar statute as evidence the legislature did not intend for that language to apply to the similar statute). But it didn't. In fact, it did the opposite when it limited the definition to "[a]s used in this section." *See* Iowa Code § 709.10(1). Nothing about the addition of section 709.10(1)(d) suggests it expands section 691.2's scope. *See State v. Burrage*, No. 09-1042, 2010 WL 2757345, at *3 n.2 (Iowa Ct. App. July 14, 2010) (noting the State conceded the presumption in section 691.2 "presumably would not apply" to out-of-state laboratories). The State conceded at oral argument that, without the help of section 709.10(1)(d), the Bode report was not admissible under section 691.2. As we find that section 709.10(1)(d) does not provide the help the State seeks, the report was not admissible under section 691.2. As such, the State was required to authenticate it in some other way. *See* Iowa R.

Evid. 5.901(a). As the State did not do that, the district court erred when it admitted the report.

But finding that the report was erroneously admitted does not end the inquiry because the State also claims the report's admission was harmless error. *See Graber v. City of Ankeny*, 616 N.W.2d 633, 641 (Iowa 2000) ("[P]rejudice is presumed when evidence is erroneously admitted, 'unless the contrary is affirmatively established.'" (citation omitted)). We agree with the State on this point. Wrongly admitted evidence may be harmless, and thus not prejudicial, if it is cumulative to other evidence. *State v. Pirie*, 18 N.W.3d 238, 246 (Iowa 2025). And here the Bode report was cumulative. Before that report was admitted, three reports from the Iowa criminalistics laboratory had already been admitted into evidence by stipulation of the parties. Those reports contained much of the same information that was included in the Bode report. The information in those reports included a "result[] of examination" that concluded that "[t]he DNA profile developed from the sperm fraction of the vaginal swab" from the rape kit "matched the known DNA profile of" McVay, and "[t]he probability of finding this profile in a population of unrelated individuals, chosen at random, would be less than 1 out of 19 octillion." Given that the DNA evidence linking McVay to the crime was already admitted, the Bode report was cumulative and its admission was harmless error. As such, we reject McVay's request for a new trial based on admission of the Bode report.

## V.    Conclusion

Having considered and denied all the arguments McVay makes on appeal, we affirm his conviction.

**AFFIRMED.**

12